UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-3 WILLIE BEE BRANCH,

Defendant.

Case No. 25-cr-20608

Honorable Robert J. White

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

## I. Introduction

On August 13, 2025, Defendant Willie Branch was indicted on one count of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). In November of 2025, Branch would be charged in a second superseding indictment with one count of conspiracy to possess with intent to distribute and to distribute cocaine, one count of possession with intent to distribute cocaine, and one count of use of a communication facility in furtherance of a violation of the controlled substances act in violation of 21 U.S.C. §§ 846, 841(a)(1), 843(b). Branch's charges are part of a larger indictment which involved the investigation and prosecution of fifteen total co-defendants.

Before the Court is Branch's motion to suppress the evidence produced as part of the search of his residence at 3775 Huntley St., Saginaw, MI ("Huntley Residence"), in which law enforcement found cocaine, guns, and money. Branch believes that the Federal Bureau of Investigation's (FBI) affidavit, upon which the Magistrate Judge's warrant was based, did not establish probable cause that the evidence of a crime would be found at the Huntley residence. The Court heard oral argument on the motion in open Court on September 1, 2026. Considering the hearing and the Parties' briefs, the Court determines that the affidavit contained probable cause to search the Huntley Residence, so Branch's motion to suppress will be denied.

**II. Background**

On August 19, 2025, FBI Agent Troy Wohlfert (Wohlfert) obtained a search warrant for the Huntley Residence. (ECF No. 222-1, PageID.956). The affidavit in support of the search warrant detailed Wohlfert's expertise as an FBI agent and as a member of the Mid-Michigan Safe Streets Task Force ("MMSSTF"). (*Id.* at PageID.933). He asserts that based on his "training, experience, and information provided to [him] by other federal, state, and local law enforcement" he is "familiar with the ways in which drug traffickers and gang members conduct their criminal enterprises and drug-related business…." (*Id.* at PageID.934). Wohlfert's experience

and determination of various communications between Branch and his alleged co-conspirators is central to the determination of probable cause in this case.

Wohlfert's affidavit explains that the FBI's investigation began, not with Branch, but with one of his alleged co-conspirators, Elisabeth Cooney. Wohlfert asserts that the FBI began investigating Cooney's alleged drug trafficking in March of 2024, and it is between then and December 2024 that at least nine controlled cocaine buys involving Cooney were conducted. (*Id.* at PageID.935).

Then, in January of 2025, court orders were signed allowing the interception of wire/electronic communications[1] related to Cooney, but also to some of the other alleged co-conspirators—these being Hugh Davis, Keith Hayes Jr., Marcellus Sanders, Barry Siler, Damone Wilbert, Levail Buriel, Malik Turner—and Defendant Branch. (*Id.*). From these calls, Wohlfert alleges a conspiracy that represents a downline of cocaine trafficking in which Andre Gibson (another co-defendant) supplied Branch, Branch and Turner then supplied Buriel, Buriel then supplied Siler and Matthew Jones (yet another co-defendant), Siler supplied Hayes, Hayes and Sanders supplied Davis, and Davis supplied Cooney. (*Id.*). While Wohlfert explains that numerous calls related to the sale and distribution of controlled substances were

---

[1] A separate motion to suppress the evidence obtained through the use of these wiretaps has been filed by Defendant Branch. *See* ECF No. 217. The Court will address those arguments in a separate opinion.

intercepted involving Branch, he details just a few which would become the backbone of the probable cause for the search warrant. (*Id.*).

*July 7, 2025 Calls:*

The first call Wohlfert presents is one of the most important. In the call Buriel calls Jones letting him know that "they here," to which Jones responds, "Okay so I [unintelligible] I can get two of them." Buriel responds, "yeah," and Jones asks him, "what's that ticket it'll be bro?" (*Id.* at PageID.936). While Buriel is seemingly thinking, he asks again, "[unintelligible] Is it going to be the same thing? [unintelligible] That same price of what you said first." (*Id.*). Buriel tells him, "Yeah you, yeah you know it's 17 a piece." (*Id.*) The two then communicate about when to meet up so Jones could "grab em." (*Id.*)

Wohlfert explains that his training and experience lead him to believe that Buriel contacted Jones to inform him that he had controlled substances for him to pick up. (*Id.* at PageID.937). He says that Jones was asking for "2" of the controlled substances and that "17 a piece" refers to $17,000, which he states is generally consistent with the price of a kilogram of cocaine in the Saginaw area. (*Id.*)

Just a minute later, that same night at 8:58 p.m., Buriel called Branch. (*Id.*) In that call Buriel asks, "can you pick me up at two? Right now?" Branch responds, "Uhhhh, ooh wee. I just hit that way," but Buriel responds, "God dang it man. I, I, I

need you bad." (*Id.*) Branch tells him to "[g]ive [him] a minute" and that he will meet him. (*Id.* at PageID.938).

Wohlfert says that based on his training and experience, but also based on "intercepted calls" and "surveillance," Buriel had contacted Branch because he needed controlled substances to give to Jones, whom he had just gotten off the phone with before calling Branch. (*Id.*) Wohlfert asserts that based on previous calls between Branch and Buriel, whenever Buriel would indicate that he "needs a ride" or asks "can you pick me up," it meant that he was requesting controlled substances, and, if there was a number associated with these requests, that was the quantity of the controlled substances being sought. (*Id.*) In this case, Wohlfert points out that Buriel asked Branch, "can you pick me up at two?," and then immediately afterward, "Right now?" (*Id.*) The call occurred at 8:58 p.m., so Branch could not literally be going to pick up Buriel at "two." Thus, the "two" was in reference to the controlled substances that Buriel needed from Branch to give to Jones as mentioned in the previous call. (*Id.*)

At 9:06 p.m. that same night, MMSSTF observed Branch arrive at the Huntley Residence, leave from there at 9:12 p.m., then arrive at Buriel's residence at 9:21 p.m. (*Id.*) Wohlfert believes that this was Branch retrieving the controlled substances from the Huntley Residence and taking them to Buriel. (*Id.* at PageID.938 –39).

At 10:21 p.m., Buriel received a call back from Jones, who let him know that he was "on [his] way back," and that he would be there "in about 30 minutes." (*Id.* at PageID.939). Wohlfert believes this was Jones confirming that he would come to Buriel and collect the controlled substances. (*Id.*). Indeed, about thirty minutes later, Jones called Buriel again confirming his arrival: "fittin ready to pull up bro." (*Id.*). Jones was seen arriving at Buriel's residence at 11:06 p.m. and then departing again at 11:38 p.m. (*Id.* at PageID.940). Wohlfert believes that Buriel handed over the controlled substances to Jones at this time. (*Id.*)

*July 24, 2025 Call:*

Another set of calls occurred in the late afternoon of July 24, 2025. First, at 5:38 p.m. Branch received a call from Gibson in which Gibson asks him, "What's going on man?" (*Id.*) To which Branch replies, "Slow motion, tryin to get this motion back." (*Id.*) Gibson asks him if there is anything he needs to do, but Branch replies, "nah, not right now [unintelligible] know what I'm sayin?" (*Id.*) Gibson tells him, "Let me know let what's going on, yeah, let me know shit, This, this hurt." (*Id.*) Gibson also tells him the seemingly innocuous phrase: "I'm patient you know so we gotta talk." (*Id.* at PageID.941). There's another short set of exchanges; then the following sequence occurs:

> Branch: Oh yeah. Oh yeah. We all we all way good. It's just, uh, you, you know playing the waiting game now.
>
> Gibson: Okay, okay, that's okay. Say less, say less, all say less.

> Branch: We, we, we, we, we, [unintelligible]
>
> Gibson: Say less.
>
> Branch: We playing the waiting game [unintelligible].
>
> Gibson: Say less, say less. Okay, yeah, so it's okay so say less. I don't even [unintelligible]. Okay I'm good. Okay I'm good. See I'm just.

(*Id.* at PageID.941–42).

Wohlfert believes that this series of exchanges relates to Branch's inability to move product very quickly ("slow motion"), to which Gibson explains that they are not making enough money ("this hurt"). (*Id.* at PageID.942). The snippets about being "patient" or "playing the waiting game" are about waiting for sales of controlled substances to pick back up, and that Branch will reach out to Gibson when he needs to resupply. (*Id.*) Wohlfert also believes that the exchange where Gibson said "say less" numerous times was an indication that he didn't want to talk on the phone in case law enforcement was monitoring their calls. (*Id.*)

*July 29, 2025 Calls:*

A few days later, on July 29, 2025 at 11:16 a.m., Branch called Gibson, telling him that he "need to bump into [him]." (*Id.* at PageID.942–43). Gibson responded, "We ready?"; and Branch replied, "Ready." (*Id.* at PageID.943). Wohlfert explains that this conversation concerns Branch's desire to get resupplied by Gibson ("need

to bump into you"). (*Id.*) The exchange of whether the two were "ready" was confirmation that the resupply could be made. (*Id.*)

Then, at 4:56 p.m. Branch made another call to Gibson in which Gibson explained that he was at a Rally's getting his grandmother some food. (*Id.* at PageID.944). He tells Branch to "pull up, if you there, just park, just park" and that he was on the way. (*Id.*). Branch responds back, "Okay." (*Id.*). Location information from Branch's phone indicates that he was in the area of Gibson's residence at about 5:00 p.m. (*Id.*). Then, at 5:30 p.m. MMSSTF observed Branch arrive back at the Huntley Residence. (*Id.*) Wohlfert believes this conversation involved a communication for Gibson to resupply Branch, who then went to Gibson's house for the controlled substances, and then Branch went back to the Huntley Residence with them. (*Id.* at PageID.944–45).

*August 2, 2025 Calls:*

A couple days later, on August 2, 2025 at 7:54 p.m., Branch would receive another call from Gibson asking him, "you ready?" (*Id.* at PageID.945). To which Branch replied, "Shit is you ready?" (*Id.*). After a bit of back and forth this short exchange occurs:

> Gibson: God damnit, no, but I mean but you remember what we owe now.
>
> Branch: Yes, 17.
>
> Gibson: Yup, then you got the other part, remember?

Branch: Yeah.

Gibson: Okay, so there we go.

(*Id.*)

Soon after, at 8:01 p.m., MMSSTF observed Branch arrive at the Huntley residence and then leave again at 8:15 p.m. (*Id.* at PageID.946). Wohlfert believes that the above exchanges indicate that Branch was ready to be resupplied, and that Gibson made sure that Branch remembered what they owed for the controlled substances ("17" and "that other part"). (*Id.*). Again, the "17" represented $17,000 which Wohlfert explains is generally consistent with the price of a kilogram of cocaine in Saginaw. (*Id.*) He believes that Branch arriving at and then leaving the Huntley Residence was him picking up the money to purchase the controlled substances. (*Id.*)

Later, at 8:22 p.m., Buriel would receive an incoming call from Siler in which the following exchange occurred:

Buriel: Yeah, um, I just got to quick little call.

Siler: Okay, let me call, see if dude, he want one earlier [unintelligible] knock the fuck out. Let me call him quick.

Buriel: Okay, okay, let me, let me see, then too [unintelligible]

(*Id.* at PageID.946–47).

Based on his experience and knowledge of the investigation, Wohlfert believes that Siler was referring to Hayes when he said, "He want[ed] one earlier," and that he would reach out to Hayes to confirm. (*Id.* at PageID.947). He believes that Buriel communicated back that he would check in with the suppliers to see if there would be controlled substances available ("let me see, then too"). (*Id.*)

Four minutes later, at 8:26 p.m., Buriel then sent a call to Branch, in which Buriel asks Branch to "pick [him] up," but Branch responds that he cannot because he's down in Detroit, but that he might come back "real early" or even that night. (*Id.* at PageID.947–48). Wohlfert reiterates that when Buriel tells Branch to "pick me up" he's really requesting to be resupplied. (*Id.* at PageID.948). Interestingly, cell phone records indicate that Branch was actually in Saginaw that night, but Wohlfert believes that Branch was really just lying to Buriel because he didn't have enough controlled substances to distribute to him; and, instead he was waiting for Gibson to resupply him before he could distribute to Buriel. (*Id.* at PageID.949).

Just five minutes later, at 8:31 p.m., Buriel called Siler. (*Id.*) In this call, Buriel tells Siler that "he had just told me it be tomorrow," but Siler responds, "Okay, yup, He had said he had already grabbed one too." (*Id.*) Buriel then explains that "he not in not in town…." (*Id.*) Buriel tells Siler to "come tomorrow," but if not the next day, then Monday. (*Id.* at PageID.949–50).

Temporally, Wohlfert believes that this conversation relates to what Buriel had just spoken to Branch about: that Branch was out of town and could not resupply Buriel but might be able to do so the next day. (*Id.* at PageID.950). Wohlfert understood the person Siler was referring to ("he had already grabbed one too") to be Hayes, meaning that Hayes had already gone and picked up controlled substances from someone else. (*Id.*). Indeed, in a search warrant executed by MMSSTF three days later on August 5, 2025, approximately one kilogram of cocaine was seized from Hayes' house. (*Id.*).

Still, on that night of August 2, 2025 at 9:24 p.m., Branch calls Gibson. (*Id.* at PageID.952). He tells Gibson that "the tires up on my way to you." (*Id.*). Gibson asks "where you at," to which Branch responds he's "[a]bout five minutes out." (*Id.*) At about 9:30 p.m., MMSSTF observed Branch arrive at Gibson's residence, and then leave five minutes later. (*Id.*). Putting it all together, Wohlfert believes that Branch left from the Huntley residence at about 8:01 p.m. with money to pay Gibson for the controlled substances. (*Id.*). This is indicated by MMSSTF's first observations of him from the night. (*Id.*). He then made it to Gibson's house to exchange money for the controlled substances. (*Id.* at PageID.953).

*Toll Records, Huntley Residence, and the Things to be Seized*

According to the toll records on Gibson's and Branch's phones, they called each other at least 50 times since April of 2025 through the issuing of the search

warrant on August 19, 2025. (*Id.*). Wohlfert also believes that all calls to individuals on the particular number of Branch's they had tapped were involved in the sale and distribution of controlled substances. (*Id.*). It is Wohlfert's belief that from at least April 2025 through August of 2025 Branch and Gibson were engaged in the distribution of controlled substances and that the relationship did not appear to be ceasing. (*Id.*).

Additionally, the Huntley Residence was confirmed as Branch's registered address. (*Id.*).

**III. Analysis**

**A. Probable Cause**

In his motion to suppress, Branch argues that Wohlfert's affidavit lacked the requisite probable cause for the Magistrate Judge to issue a search warrant of the Huntley Residence. In particular, he argues that all of Wohlfert's translations of the tapped phone calls were "merely suspicions" which are left uncorroborated. (ECF No. 218, PageID.894).

The Fourth Amendment to the Constitution affirmatively states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Search warrants of places must have a "probable cause nexus," which is a requirement that an affidavit in

support of a search warrant sufficiently show that the "specific 'things' to be searched for" (here, evidence of drug trafficking) are "located on the property to which entry is sought" (here, the Huntley Residence). *United States v. Sanders*, 106 F.4th 455, 460–61 (6th Cir.), *cert. denied*, 145 S. Ct. 603, 220 L. Ed. 2d 237 (2024) (cleaned up). When a district court reviews an issuing judge's probable cause determination, it must afford that determination "great deference." *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Accordingly, a district court should "overturn that decision only if the [issuing judge] arbitrarily exercised" the judge's authority. *Id.* at 311–12 (cleaned up).

Further, the Supreme Court has explained that probable cause "exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Gates*, 462 U.S. at 238). And probable cause as a concept "depends on the totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Gates*, 462 U.S., at 232) , with "no model fact pattern" for determining whether there is a fair probability that the evidence of a crime will be found at the place to be searched, *Sanders*, 106 F.4th at 462.

Still, one model for establishing probable cause has been tried and true. This is when "a search warrant affidavit…adequately establishes both where a defendant

resides as well as the defendant's active engagement in certain criminal activity." *Id.* at 462. In these circumstances, "an inference can reasonably be made (especially when *aided by an affiant-officer's experience*) that the 'criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence.'" *Id.* (quoting *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008)) (emphasis added). Cases like this that involve drug crimes are referred to as "known drug dealer" cases. *Id.* (collecting cases). Being a known drug dealer alone, however, will not suffice to establish probable cause. Instead, the known drug dealer inference can establish probable cause in those cases in which the dealer is engaged in "'continual and ongoing operations' typically involving large amounts of drugs." *United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021) (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)). The government argues that Branch is a known drug dealer, and so the probable cause determination can be made in line with this set of cases. (ECF No. 242, PageID.1319).

In support of this assertion, the Government points to the various phone calls and observations of Branch's movements as interpreted by Wohlfert. In particular, the Government points to the details of the phone calls from July 7, 2025 in which Buriel allegedly received a call from Jones requesting two kilograms of cocaine, who then called Branch to ask for those same two kilograms. (*Id.* at PageID.1321). Buriel told Jones that it was going to be "17 a piece," which Wohlfert avers is the

general price for a kilogram of cocaine in Saginaw ($17,000). (ECF No. 222-1, PageID.936–37). The real smoking gun the Government points to is Buriel asking Branch to "pick [him] up at two…right now," even though the call went through at 8:58 p.m. (*Id.* at PageID.937). Branch then went to his house, left, then went to Buriel's house, which Wohlfert's affidavit explains is consistent with going to his house to pick up controlled substances and then delivering them to Buriel. (*Id.* at PageID.938–39).

The Government also points to both the events of July 29 and August 2. On the former date, Branch told Gibson he needed to "bump" into him, and the two coordinated to meet at Gibson's place, after which Branch went back home to the Huntley Residence. (*Id.* at PageID.943–45). Wohlfert believes this represents an encounter where Gibson resupplied Branch, who then took the controlled substances back to his house. (*Id.* at PageID.944–45).

As to August 2, this is the string of phone calls involving Buriel and Siler in which Siler told Buriel that "he" (whom Wohlfert believes is Hayes) wanted "one earlier." (*Id.* at PageID.947). Based on the code that Wohlfert had identified from his experience, he believes that the "one" in question was controlled substances. (*Id.*) If that is true, the next call that Buriel made to Branch to "pick [him] up," combined with the following call that Buriel made to Siler where Siler expresses that "he" (meaning Hayes) "had already grabbed one" (meaning controlled substances), is

indicative that Buriel was attempting to buy cocaine from Branch to get for Hayes, at least based on Wohlfert's interpretation. (*Id.* at PageID.946–50). Wohlfert's opinion is buttressed by the fact that approximately one kilogram of cocaine would be found at Hayes' residence just three days later. (*Id.* at PageID.950).

On the other hand, Branch argues that all these connections are mere speculations drummed up by Wohlfert and are not conclusive enough to establish probable cause. Branch points out that Wohlfert never saw any drugs or packages or money being exchanged between Branch and any of the alleged co-conspirators in the events detailed in the affidavit. (ECF No. 218, PageID.894–97). Additionally, he argues that the cocaine found at Hayes' residence might be completely unrelated to the phone calls intercepted on August 2. (*Id.* at PageID.897–98). Indeed, there is no indication of the "he" that Siler was speaking to Buriel about was actually Hayes other than Wohlfert's experience working the case. Branch even contests that the price of cocaine in Saginaw goes for $17,000 a kilogram, pointing to documents form the U.S. Department of Justice and other publications. (*Id.* at PageID.898–99).

These are valid criticisms of Wohlfert's affidavit, but probable cause is determined by the "totality of the circumstances," *Pringle*, 540 U.S. at 371, and the Magistrate Judge's findings are to be given "great deference" *Christian*, 925 F.3d at 311. This isn't merely a case based solely on Wohlfert's suppositions. Rather, there is ample circumstantial evidence here to indicate that there was a large-scale drug

operation, including the consistent use of "17" as a price, the fact that Buriel asked Branch to "pick [him] up at two…right now," even though it was near 9:00 p.m., the fact that Siler said that "he" (Hayes) was asking for "one," and then approximately one kilogram of cocaine was found at Hayes' residence just three days later; and all along the way Branch is consistently driving back and forth from the Huntley Residence to meet Gibson or Buriel.

The Supreme Court has emphasized that "[p]robable cause 'is not a high bar'" to clear. *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Indeed, the Sixth Circuit in *Sanders* specifically expressed that there is no checklist and "no model fact pattern" for establishing probable cause. *Sanders*, 106 F.4th at 462. This is because a "hypertechnical[,] ... line-by-line scrutiny[]" of an affidavit has been forbidden by the Supreme Court. *Christian*, 925 F.3d at 311 (quoting *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)). Considering the totality of the information presented to the Magistrate Judge, the Court concludes that the Magistrate Judge did not "arbitrarily exercise[]" her authority in issuing the search warrant of the Huntley Residence. *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) (citing *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)).

Branch fights back against this analysis. He believes that something more than Wohlfert's interpretations from experience must undergird the probable cause

analysis that there was large-scale drug dealing occurring at the Huntley Residence. He cites several cases where the Sixth Circuit reversed lower courts and required suppression of seized evidence. But these cases all suffer in one clear way: there was not a sufficient nexus between the defendant's residences and the alleged drug dealing. The Court will cover a handful of the cases Branch cites to illustrate this weakness.

In *United States v. McPhearson*, for example, officers arrested the defendant outside his residence on an unrelated, non-drug offense warrant and discovered a small amount of crack cocaine on his person, but the affidavit contained no facts showing that he was a drug dealer or otherwise connecting drug trafficking to his home. 469 F.3d 518, 524–25 (6th Cir. 2006). The Sixth Circuit rejected the government's inference that because the defendant possessed drugs on his person, additional drugs would probably be found inside his residence. *Id.* at 524–25.

Next, in *United States v. Brown*, although the affidavit contained evidence linking the defendant to drug trafficking, it did not establish a sufficiently "specific and concrete" connection between that drug dealing and the defendant's residence. 828 F.3d 375, 382–85 (6th Cir. 2016). In *United States v. Ward*, which actually addressed the good faith exception to the exclusionary rule, the affidavit lacked facts connecting the defendant's drug activity to his home because there was no tip that the defendant sold drugs from the residence, no controlled purchases occurred there,

and no other sort of evidence establishing the required nexus between ongoing drug dealing and the defendant's home. 967 F.3d 550, 554–56 (6th Cir. 2020). Lastly, in *United States v. Grant*, there was ample evidence that the defendant was a drug dealer, including a controlled purchase of cocaine, and additional observations that he made short visits to the residence the police sought to search. No. 21-3686, 2023 WL 119399, at *1–4 (6th Cir. Jan. 6, 2023). But importantly, the controlled purchase occurred elsewhere, officers never saw the defendant enter or leave his place before or after a drug transaction, and the defendant's visits at the residence were brief. *Id.* at *3.

As the Court has stated before, the nexus between the Huntley Residence and illicit drug dealing are stronger here. On July 7, when Buriel called Branch and asked him to "pick [him] up at two…Right now" Branch changed course from where he was headed, arrived at the Huntley Residence, remained there for six minutes, and proceeded directly to Buriel's residence. Unlike the affidavits in *McPhearson*, *Brown*, *Ward*, and *Grant*, Wohlfert's affidavit described Branch traveling to the residence to be searched in the middle of intercepted phone communications. Indeed, two other days of intercepted phone conversations are also key. On July 29, Branch told Gibson that he "need[ed] to bump in to" him, which Wohlfert believed meant that Branch sought resupply of controlled substances. Later that day, location information placed Branch near Gibson's residence at approximately 5:00 p.m., and

surveillance observed Branch return to the Huntley Residence at approximately 5:30 p.m. Wohlfert interpreted that to mean that Branch obtained controlled substances from Gibson and returning to the Huntley Residence to store them. And this pattern continued once more on August 2. After Gibson asked Branch whether he was "ready" and reminded him that "we owe now" "17" plus "that other part," officers observed Branch arrive at the Huntley Residence at 8:01 p.m. and leave at 8:15 p.m. From there, Branch traveled to Gibson's place, where officers observed him arrive later that evening. These other two dates, plus July 7, are indicative of repeated movements to and from the Huntley Residence intertwined with the intercepted conversations that Wohlfert interpreted to be about Branch's resupply and dealing of cocaine. As it pertains to the nexus between a large-scale drug operation and the Huntley Residence, there is a much stronger nexus than in the cases that Branch points to. Thus, the warrant did not lack probable cause.

### B. Staleness

Additionally, Branch argues that the evidence upon which the warrant was based was stale. He contends that, "even if those events and conclusion [supplied by the affidavit] had properly established that Branch had committed a crime, the crime occurred at least 17 days before the search warrant was later sought on August 19th." (ECF No. 218, PageID.904).

To be sure, "stale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). This is because "[a] warrant must be supported by 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*.'" *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (quoting *Sgro v. United States*, 187 U.S. 206, 210 (1932)) (emphasis in original). But the staleness inquiry "depends on the 'inherent nature of the crime.'" *Frechette*, 583 F.3d at 378 (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir.1998)).

When determining whether information is stale, the court is to consider the following factors:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?),
>
> (2) the criminal (nomadic or entrenched?),
>
> (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and
>
> (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Id.* (citing *United States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir.2006)). The application of these factors indicates that the information presented in the affidavit to the Magistrate Judge was not stale.

*1. Character of the Crime*

First, the Court finds that the character of the alleged crime was a regenerative conspiracy. Indeed, as Wohlfert has explained there were at least fifty phone conversations between Gibson and Branch during the months long period between April 2025 and August 2025, and during the intercepted period, "only one intercepted call did not involve the sale and distribution of controlled substances." (ECF No. 222-1, PageID.953). And as the Court has already explained, the repeated comings and goings from the Huntley Residence, along with the coded language as interpreted by Wohlfert, indicate that a large scale and ongoing drug operation was occurring at Branch's home. And because "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness," *Greene*, 250 F.3d at 481, the character of the crime leans in favor of the information not being stale.

*2. The Defendant*

This factor asks whether the defendant is nomadic or entrenched in the local area. The theory here is that a defendant moving from place-to-place, as opposed to staying in one location, will naturally "decrease the probability of finding evidence at a given location." *Abboud*, 438 F.3d at 573. But the affidavit confirms that the Huntley Residence is Branch's registered address with the Michigan Secretary of State and location information was consistent with it being his primary residence. (ECF No. 222-1, PageID.953). This factor does not support Branch's staleness arguments.

*3. The Thing to be Seized*

The third factor asks courts to determine whether the items to be seized were "perishable and easily transferrable or of enduring utility to its holder." *Abboud*, 438 F.3d at 573. Normally, the consumable nature of narcotics means that this factor will favor defendants. *See Frechette*, 583 F.3d at 378. But that is not so when a search warrant seeks more than the drugs themselves. *See United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) (explaining that the third factor weighed against a finding of staleness because the items to be seized in the search warrant included non-perishable items such as firearms, business records, and drug paraphernalia). Here, the things to be seized not only included the controlled substances themselves, but also "materials and equipment for manufacturing, handling, or distributing of controlled substances," "currency and items or instruments used to count or hold this currency," literature pertaining to the use and distribution of controlled substances, records, etc. (ECF No. 222-1, PageID.955). Because of the combination of both controlled substances and other, non-perishable items sought to be seized, the Court finds this factor to favor neither side.

*4. The Place to be Searched*

Lastly, courts must determine whether the searched property was a "mere criminal forum of convenience or secure operational base." *Abboud*, 438 F.3d at 573. The continued back and forth between Branch's home and his dealings with

Gibson and Buriel, as interpreted by Wohlfert, indicate that Branch used the Huntley Residence as a secure operational base, not a forum of convenience. This last factor does not favor staleness, and, on balance, the weight of the other factors do not either. So the information the Magistrate Judge relied on in determining probable cause was not stale.

### C. Good Faith Analysis

The Government argues that, even if the affidavit lacked sufficient probable cause, the good faith exception to the warrant requirement should apply. The Supreme Court has adopted what is known as the "exclusionary rule" as the "principal judicial remedy to deter Fourth Amendment violations." *United States v. Neal*, 106 F.4th 568, 571 (6th Cir. 2024) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). "The rule's purpose…is to deter police misconduct." *Id.* (citing *Davis v. United States*, 564 U.S. 229, 246 (2011)). Considering these principles, in *United States v. Leon* the Supreme Court held that judicial suppression of the fruits of a search warrant is inappropriate when an officer conducts a search in "objectively reasonable reliance" on a warrant that is later determined to be invalid. 468 U.S. 897, 922 (1984). In that scenario, the theory goes, "the authorizing judge—not the officer—is the blameworthy party." *Neal*, 106 F.4th at 572.

But there are times in which an officer conducts a search while lacking a good faith belief in the stated basis for seeking the warrant. In these cases, the officer's

conduct is at issue and suppression is warranted. *Id.* (citing *Leon*, 468 U.S. at 923). Such times when an officer acts without "good faith" include when a supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)). Branch argues that Wohlfert's affidavit was lacking in any indicia of probable cause.

The Sixth Circuit has defined the times when a warrant, along with its supporting affidavit, is so deficient that it not only lacks a "probable cause nexus," but is also "bare bones" such that the good faith exception does not apply. These are times when "the warrant lacks a 'minimally sufficient nexus' between the place to be searched and the evidence of wrongdoing to be seized at that place." *Neal*, 106 F.4th at 572 (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004)). And the test for a "minimally sufficient nexus" is lower than the "fair probability" needed to demonstrate nexus for purposes of probable cause. *Id.* (citing *United States v. Reed*, 993 F.3d 441, 450–51 (6th Cir. 2021)). Accordingly, a "minimally sufficient nexus" is not a high bar — only requiring a "'modicum of evidence, however slight' connecting the illegal activity and the place to be searched." *Id.* (quoting *United States v. White*, 874 F.3d 490, 496–97 (6th Cir. 2017)). Thus, to be "bare bones," an affidavit must "consist of no more than a hunch that evidence might be found at a location." *Id.* This occurs, for example, "when an affidavit is 'completely devoid' of

facts relevant to the probable cause inquiry or is 'so vague as to be conclusory or meaningless.'" *Id.* (quoting *Carpenter*, 360 F.3d at 595–96).

And the Court concludes that Wohlfert's affidavit established a "minimally sufficient nexus" between the items sought (controlled substances, drug paraphernalia, records, drug currency, drug literature, etc.) and the place to be searched (the Huntley Residence). As the Court has explained, the intercepted phone calls from July 7, July 29, and August 2, are indicative of large-scale drug dealing involving the Huntley Residence as a base of operations in which Branch either returned with controlled substances, left to deal controlled substances, or left with money to acquire controlled substances. Additionally, records confirm that the Huntley Residence is Branch's primary residence. As the Sixth Circuit explained in *Sanders*, known drug dealer status and the dealer's residence can provide circumstantial evidence establishing probable cause to search the residence, in this case the Huntley Residence, for drug trafficking evidence. *See Sanders*, 106 F.4th at 464 –65. This is because "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991) (citation omitted). And the affidavit indicates that the drug dealing at the Huntley Residence was a "'continual and ongoing operations,'" *Sheckles*, 996 F.3d at 342 (quoting *McCoy*, 905 F.3d at 418), as indicated by the fifty calls Branch made to Gibson over several months and the separate intercepted phone calls and events of

July 7, July 29, and August 2. All combined, this evidence provides at least a "minimally sufficient nexus" between illicit drug dealing and the Huntley Residence. So the good faith exception as espoused in *Leon*, too, counsels against suppression.

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendant Branch's motion to suppress, (ECF No. 218), is **DENIED.**

Dated: November 13, 2026

s/Robert J. White
Robert J. White
United States District Judge